**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| FRANCIS FASLINE, | ) | CASE NO. 4:24-cv-2192 |
| | ) | |
| | ) | |
| Plaintiff, | ) | CHIEF JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION |
| | ) | AND ORDER |
| CITY OF CAMPBELL, *et al.*, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff Francis Fasline ("Fasline") was bitten by a police dog during a December 30, 2023, encounter with members of defendant City of Campbell ("City") Police Department. He brings this civil rights action under 42 U.S.C. § 1983 and state law against the City and two of its police officers, Sergeant Timothy Rauschenbach ("Sgt. Rauschenbach") and Officer Jacob Xenakis ("Officer Xenakis") (collectively, "defendants"), seeking to recover damages sustained during the encounter.

Now before the Court is defendants' motion for summary judgment. (Doc. No. 35.) In their motion, Sgt. Rauschenbach and Officer Xenakis seek qualified immunity from the § 1983 claims (*id*. at 14[1]–19), and all defendants maintain that they are entitled to immunity from Fasline's

---

[1] Unless otherwise noted, all page number references are to the consecutive page numbers applied to each individual document by the Court's electronic filing system. Because the deposition transcripts appear in a multi-page format, citations to the depositions also include in parentheses the page number assigned to each individual page by the court reporter.

state law claims. (*Id.* at 23–24, 27.) Defendants also insist that the record does not support the remaining federal and state claims. (*Id.* at 19–27.) Fasline filed an opposition to the motion (Doc. No. 40), and defendants filed a reply. (Doc. No. 42.) For the reasons that follow, the motion is granted, and the case is dismissed.

I.      **BACKGROUND**

Most of the December 30, 2023, incident was recorded by three police cameras: (1) Officer Xenakis' Body Worn Camera (Doc. No. 35-2 (Affidavit of Jacob Xenakis ¶ 3 (Ex. 1))); (2) Sgt. Rauschenbach's Body Worn Camera (*Id.* ¶ 4 (Ex. 1))); and (3) Sgt. Rauschenbach's Cruiser Dash Camera (*Id.* ¶ 5 (Ex. 1))); *see also* Doc. No. 35-3 (Notice of Manual Filing of Flash Drive with Videos), at 3.1 (Xenakis Body Worn Camera), 3.2 (Rauschenbach Cruiser Dash Camera), 3.3 (Rauschenbach Body Worn Camera).) While no one video captures the entire encounter, the parties agree that the three videos, viewed together, provide a fairly complete picture of the events that transpired on the night in question. (Doc. No. 35, at 8; Doc. No. 40, at 4.)

"Ordinarily in summary-judgment [proceedings] involving qualified immunity (like this one)," the court "view[s] the facts in the light most favorable to the plaintiff." *Rudlaff v. Gillispie*, 791 F.3d 638, 639 (6th Cir. 2015) (citing *Scott v. Harris*, 550 U.S. 372, 378, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007)). But in cases like this one involving police camera footage, the court views the events "in the light depicted by" the video evidence. *Scott*, 550 U.S. at 378–81; *see Feagin v. Mansfield Police Dep't*, 155 F.4th 595, 600–01 (6th Cir. 2025) (recognizing that it is "now the rule more than the exception" that police interactions are occurring within "the scope of a camera's lens[,]" and emphasizing that reliance on police video "better equip[s a court] to evaluate claims tied to an officer's conduct." (cleaned up)). "For those moments where the footage does not aid

2

[the Court's] understanding, [the Court] fill[s] in the blanks by considering disputed evidence in a light most favorable to [Fasline], completing the story with any uncontested factual assertions the officers proffer." *Feagin*, 155 F.4th at 601 (citation omitted); *see Lattis v. Phillips*, 878 F.3d 541, 544 (6th Cir. 2017) (for any "gaps or uncertainties" in the video evidence, the court reverts to the non-moving party's version of events).

On the evening of December 30, 2023, Sgt. Rauschenbach was dispatched to the area of Dumont and Gertrude Streets, in the City of Campbell, in response to a call from Samantha Rossadivita ("Rossadivita"), who advised that her ex-boyfriend, Fasline, was "drunk . . . driving up and down Gertrude, yelling out the window." (Doc. No. 33 (Rauschenbach Dep.), at 4(10), (12); *see* Doc. No. 34 (Fasline Dep.), at 8(24–25).) According to Fasline, he and Rossadivita had attended a birthday party for their young son earlier that evening, and he became angry when he discovered that she had taken the presents with her when she left the party with their son. (Doc. No. 34, at 7(18), (20–21).) He admits he was upset and decided to follow her to try to recover the presents. (*Id*. at 8(22–25).) He also admits that he had consumed one half of a Twisted Tea alcoholic beverage prior to getting into his car. (*Id*. at 8(23).)

Sgt. Rauschenbach located Fasline's car following the vehicle that was driven by Rossadivita. As the sergeant approached the two vehicles, he observed Fasline drive through a stop sign without stopping, prompting Sgt. Rauschenbach to activate his lights and siren. (Doc. No. 35-3.2, at :28–:31; *see* Doc. No. 34, at 9(26) (Fasline admitting he ran the stop sign).) Rossadivita pulled into the driveway of her mother's house, Fasline pulled into the driveway immediately behind Rossadivita's vehicle, and Sgt. Rauschenbach parked his cruiser, with his lights still flashing, behind Fasline's car at an angle. (Doc. No. 35-3.2, at :31–:46.)

3

Even though Fasline knew that he was supposed to stay in his car when being pulled over by a police officer (Doc. No. 34, at 9(26–27), Fasline immediately exited his vehicle. (Doc. No. 35-3.2, at :47–:51.) As Sgt. Rauschenbach was exiting his cruiser, he yelled at Fasline to "stay in your car." (Doc. No. 35-3.2, at :49–:51; Doc. No. 35-3.3, at :49–:51.) Rather than comply, Fasline closed the car door behind him and continued to take several steps away from his vehicle. (Doc. No. 35-3.2, at :51–:56.) Sgt. Rauschenbach approached Fasline and instructed him to "face the vehicle" several times. (Doc. No. 35-3.3, at :52–1:00.) When Fasline did not comply, Sgt. Rauschenbach attempted to physically turn him to face the vehicle. (Doc. No. 35-3.3, at :55–:56.) Fasline again resisted—physically attempting to turn back to face the sergeant—and repeatedly argued, "Don't do that to me." (Doc. No. 35-3.3, at :56–1:01.) Fasline continued to resist, and Sgt. Rauschenbach attempted to push him toward the vehicle. (*Id.*) After unsuccessfully directing Fasline three times to "put your hands behind your back[,]" Sgt. Rauschenbach spoke into his radio that he had a "Code 7." (Doc. No. 35-3.3, at 1:01–:08.) A Code 7 refers to a possibility of trouble and alerts dispatch that the officer wants a second police officer sent to the scene. (Doc. No. 33, at 11(39).)

The two men continued to scuffle as Fasline resisted Sgt. Rauschenbach's efforts to get him to put his hands behind his back. Sgt. Rauschenbach then attempted to use a takedown maneuver, which Fasline resisted while he shouted "F—k you trying to throw me for?"; "What are you trying to throw me for, I ain't trying to throw you." (Doc. No. 35-3.3, at 1:09–:23.) Sgt. Rauschenbach then placed Fasline in a headlock as he yelled, "Get on the ground." (Doc. No. 35-3.3, at 1:21–:24; Doc. No. 35-3.2, at 1:21–:24.) A second takedown maneuver proved successful, and the two men went to the ground, though Fasline continued to resist and fight with Sgt.

Rauschenbach. (Doc. No. 35-3.3, at 1:24–:25; Doc. No. 35-3.2, at 1:24–:25.)

Meanwhile, a second police officer, Officer Xenakis, arrived with his police dog, Ranger. Ranger is a Dutch Shepherd Malinois mix. (Doc. No. 32 (Xanakis Dep.), at 5(15).) Officer Xenakis and Ranger successfully completed the Ohio Peace Officer Training Academy's ("OPOTA") certified K-9 training course and received their certification in September 2023. (*Id*. at 3(7–9).) The two were timely recertified on June 13, 2024, and there is no dispute that Officer Xenakis and Ranger were current with their K-9 training at the time of the incident. (*Id*. at 3(9), 5(14).) Officer Xenakis had been advised by dispatch that a caller had complained that her ex-boyfriend, Fasline, was "possibly intoxicated" and was "speeding" and driving "erratically[.]" (*Id*. at 6(19).) Officer Xenakis was familiar with Fasline, and had been involved in several police encounters with him, often resulting in Fasline "either fighting with [the police] or resisting arrest of some sort." (*Id*. at 19(72).)

Officer Xenakis parked his cruiser on the street near the driveway where Sgt. Rauschenbach and Fasline were wrestling. (Doc. No. 35-3.1, at :08.) He and Ranger, who was off leash, exited the cruiser and began running toward Fasline and Sgt. Rauschenbach. (Doc. No. 35-3.1, at :09–:15; Doc. No. 32, at 8(27).) As they approached, it is evident from Officer Xenakis' body worn camera that Sgt. Rauschenbach was still attempting to gain control of Fasline, as Fasline is on his knees and Sgt. Rauschenbach is seen on top of Fasline with his feet in the air attempting to use his full body weight to force Fasline to the ground. (Doc. No. 35-3.1, at :15.)

The parties dispute what happened next. In his deposition, Office Xenakis testified that he issued a warning to Fasline to stop resisting or he would release Ranger. (Doc. No. 32, at 8(27).) Sgt. Rauschenbach also testified that he heard Officer Xenakis warn Fasline that he would be bitten

by the police K-9 if he did not cease fighting. (Doc. No. 33, at 10(34).) Fasline denies hearing any such warning. (Doc. No. 34, at 10(31).) From Sgt. Rauschenbach's body worn camera, Officer Xenakis can faintly be heard saying something, but it is entirely unclear what he said. (Doc. No. 35-3.3, at 1:23–:24.)[2] Because the videos did not clearly record Xenakis' initial words and the Court must resolve any factual discrepancies in Fasline's favor, the Court presumes for purposes of the present motion that no warning was given before Ranger was released.[3]

What happened next, however, is not in dispute. Ranger arrived on the scene ahead of Officer Xenakis and accidently bit Sgt. Rauschenbach in the leg. Sgt. Rauschenbach immediately yelled and then said "F—k" as he released his hand from Fasline. (Doc. No. 35-3.2, at 1:28–:32; Doc. No. 35-3.3, at 1:28–:32; Doc. No. 35-3.1, at :14–:15.) Sgt. Rauschenbach then got up and walked away limping and groaning. Sgt. Rauschenbach's breathing was labored and he put his hands on his knees and said "F—k" again. He first advised Officer Xenakis that he was not okay, but then stated "Nah, we're good." He eventually—slowly and unsteadily—made his way back to the scene. (Doc. No. 35-3.3, at 1:32–2:03.)

The moment Sgt. Rauschenbach was bitten and released his grip on Fasline, Fasline got up

---

[2] Officer Xenakis and Ranger were still some distance away from the scene when Officer Xenakis' voice is heard on Sgt. Rauschenbach's body worn camera saying something unintelligible. In his deposition, Officer Xenakis explained that when he activates his body worn camera, there is no audio for the first 30 seconds, and, therefore, it provides no audio account of anything that was said during the first moments after Officer Xenakis and Ranger arrived. (Doc. No. 32, at 9(33); *see* Doc. No. 35-3.1.) Sgt. Rauschenbach's cruiser camera and body worn cameras also do not contain any audio for the first 30 seconds after activation. (Doc. No. 35-3.2; Doc. No. 35-3.3.) While Fasline suggests that it is "[c]urious[]" that the "body cam sound is not activated until after this purported warning occurs" (Doc. No. 40, at 9 n.1), he offers no evidence to suggest that the City's cameras were either manipulated or work any other way than to mute audio for the first 30 seconds. In any event, on summary judgment, the Court resolves the question of fact regarding the existence of the warning in Fasline's favor, finding that there is an issue of fact as to whether the warning was given.

[3] The City's K-9 deployment policy provides, in relevant part, "In all cases where the canine may confront a suspect and the incident may result in a canine bite, the handler shall make a verbal announcement or warning that a police canine has been deployed unless exigent circumstances exist to dictate otherwise." (Doc. No. 35, at 12 (citing Canine (K9) Policy, Section C).)

from the ground and asked, "What are you guys doing, man?" (Doc. No. 35-3.2, at 1:31-:35; Doc. No. 35-3.3, at 1:31–:35; Doc. No. 35-3.1, at :23.) Officer Xenakis then engaged Fasline and attempted to force him back to the ground. He managed to gain control of Fasline's right arm and place it in handcuffs, but Fasline's left arm was still loose and flailing. (Doc. No. 35-3.2, at 1:36–:40.) Officer Xenakis released Ranger, who bit Fasline's left arm. (Doc. No. 35-3.1, at :25.) Fasline continued to struggle as Officer Xenakis attempted to place the handcuff around Fasline's left wrist. (Doc. No. 35-3.1, at :25–:29.) Fasline began to repeatedly yell "ow", and Officer Xenakis told Fasline to put his hand behind his back. Officer Xenakis repeated more loudly the directive for Fasline to put his hand behind his back, and Fasline indicated that he "can't" and that the police dog "got my arm bro." Officer Xenakis assured him that the dog would come off when he was in cuffs. (Doc. No. 35-3.1, at :30–:52.) Officer Xenakis managed to place a hand on Fasline's left arm and tried, without success, to cuff his left wrist. (Doc. No. 35-3.1, at :52–1:08.) He then advised Sgt. Rauschenbach, "Hey Sarge, I need some help here." (Doc. No. 35-3.1, at 1:06–:07.) Sgt. Rauschenbach continued walking back to the scene, and asked "what do you need?" (Doc. No. 35-3.3, at 2:17–:19.) Officer Xenakis directed Sgt. Rauschenbach to take Fasline's left arm, which he did. (Doc. No. 35-3.3, at 2:20–:26.) As Sgt. Rauschenbach attempted to cuff Fasline's left arm behind his back, Officer Xenakis used a breaker bar to release Ranger from his bite-hold. (Doc. No. 35-3.1, at 1:21–:25.) Once free from Ranger's bite, Fasline swore at the officers and continued to move and resist, at which point Sgt. Rauschenbach had to tell Fasline to "lay on the ground" so that he could cuff him. (Doc. No. 35-3.1, at 1:26–:33; Doc. No. 35-3, at 2:40–:42.) Sgt. Rauschenbach was finally able to secure the cuff around Fasline's left wrist more than two and one-half minutes after the start of the encounter. (Doc. No. 35-3.1, at 1:31–:41; Doc. No. 35-3.2,

7

at 2:41–:52; Doc. No. 35-3.3, at 2:41–:52.)

Sgt. Rauschenbach then transported Fasline to the police station where paramedics tended to his injuries. (Doc. No. 35-3.2, at 4:54–7:52; Doc. No. 34, at 12(40).) Fasline was charged with operating a vehicle while intoxicated ("OVI"), resisting arrest, obstructing official business, assaulting a police officer, and a stop sign violation. (Doc. No. 40, at 7.) Fasline pleaded guilty to OVI, and the remaining charges were dismissed in exchange for his guilty plea. (*Id.*)

This lawsuit followed. In Count One of the complaint, Fasline alleges that the officers used excessive force (Doc. No. 1 (Complaint) ¶¶ 29–36), and in Count Six, he alleges that the officers failed to intervene to prevent this alleged unconstitutional use of force. (*Id.* ¶¶ 61–63.) In Count Seven, he brings a *Monell* claim against the City (*id.* ¶¶ 65–73), and, in Count Four, he alleges that the City is liable under a theory of respondeat superior. (*Id.* ¶¶ 53–54.) Fasline also brings state law claims against all three defendants for strict liability for a dog bite (Count Two, *id.* ¶¶ 38–46), intentional infliction of emotional distress (Count Three, *id.* ¶¶ 48–51), abuse of process (Count Five, *id.* ¶¶ 56–59), assault and battery (Count Eight, *id.* ¶¶ 75–81), and civil conspiracy. (Count Nine, *Id.* ¶¶ 83–86.)

In his opposition brief, Fasline concedes that there is insufficient evidence in the record to support his *Monell* claim, as well as his claims for respondeat superior liability, abuse of process, and civil conspiracy. (Doc. No. 40, at 17.) Accordingly, and after review, the Court dismisses Counts Four, Five, Seven, and Nine.

## II.     STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that a "party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which

8

summary judgment is sought[,]" and that the "court shall grant summary judgment if the movant

shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law." Fed. R. Civ. P. 56(a). Alternatively, summary judgment is denied if "there are

'any genuine factual issues that properly can be resolved only by a finder of fact because they may

reasonably be resolved in favor of either party[.]'" *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th

Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 91 L. Ed.

2d 202 (1986)).

The party seeking summary judgment has the initial burden of informing the court of the

basis for its motion and identifying those portions of the record—including pleadings, depositions,

written discovery responses, and affidavits—that it believes demonstrate the absence of a genuine

issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d

265 (1986); Fed. R. Civ. P. 56(a), (c). In opposing summary judgment, the nonmoving party cannot

rest on its pleadings or merely reassert its previous allegations. *Liberty Lobby, Inc.*, 477 U.S. at

248–49. Instead, the nonmoving party must "go beyond the pleadings" and present some type of

evidentiary material in support of its position. *Celotex*, 477 U.S. at 324. In determining whether

those standards are met, the "court need consider only the cited materials, but it may consider other

materials in the record." Fed. R. Civ. P. 56(c)(3).

In ruling on a motion for summary judgment, it is not the judge's function to "weigh the

evidence and determine the truth of the matter but to determine whether there is a genuine issue

for trial." *Liberty Lobby, Inc.*, 477 U.S. at 249. In determining whether a genuine issue of material

fact exists, the court must assume as true the evidence of the nonmoving party and draw all

reasonable inferences in that party's favor. *Id.* at 255 (citation omitted). But the "mere existence

9

of a scintilla of evidence" in support of the nonmoving party is not enough to avoid summary judgment. *Id*. at 252. Put differently, "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* Ultimately, the inquiry is "whether reasonable jurors could find by a preponderance of the evidence that the [nonmoving party] is entitled to a verdict[.]" *Id.*

### III. DISCUSSION

#### A. Section 1983 Claims against the Officers

Fasline claims that Sgt. Rauschenbach and Officer Xenakis violated his constitutional rights by using excessive force in arresting him, and by failing to intervene to prevent the excessive force employed by the other responding officer. (Doc. No. 1 ¶¶ 29–36, 61–63; Doc. No. 40, at 8–13.) The officers maintain that they are entitled to qualified immunity on both claims because their use of force was objectively reasonable, and, in any event, neither officer had a realistic opportunity to intervene. (Doc. No. 35, at 15–19.)

"Qualified immunity shields public officials from personal liability under § 1983 unless they 'violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Helphenstine v. Lewis Cnty., Ky.*, 60 F.4th 305, 326 (6th Cir. 2023) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)), *cert. denied,* 144 S. Ct. 692, 217 L. Ed. 2d 388 (2024). "At summary judgment, a government official is entitled to qualified immunity unless the evidence, viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that (1) the defendant violated a constitutional right; and (2) the right was clearly established." *Jackson-Gibson v. Beasley*, 118 F.4th 848, 853 (6th Cir. 2024) (citation and quotation marks omitted); *see Vakilian v. Shaw*, 335 F.3d 509, 517 (6th Cir. 2003) (A plaintiff must establish both prongs "[t]o overcome an officer's entitlement to qualified

10

immunity." (citations omitted)). Applying those standards here, the Court concludes that Sgt. Rauschenbach and Officer Xenakis are entitled to qualified immunity.

### 1. Count One—Excessive Force

Start with the excessive force claim. The Fourth Amendment prohibits excessive force during an arrest. *Graham v. Connor*, 490 U.S. 386, 395, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). "Whether an officer exerts excessive force is determined under an objective reasonableness standard[,]" as "judged from the perspective of a reasonable officer at the scene, and not from the 20/20 vision of hindsight." *Jackson-Gibson*, 118 F.4th at 854 (citations and quotation marks omitted). That viewpoint is important, because "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. The objective reasonableness standard recognizes that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, [] violates the Fourth Amendment." *Id.* at 396 (citation and quotation marks omitted).

To determine whether force was reasonable, the Court must "consider the totality of the circumstances and specifically address: (1) the severity of the crime; (2) the suspect's immediate threat to officers or others; and (3) whether the suspect [was] actively resisting or evading arrest." *Jackson-Gibson*, 118 F.4th at 854 (citing *Graham*, 490 U.S. at 396). Ultimately, that multi-factor analysis helps to balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (cleaned up).

When determining whether officers used excessive force, there is "no easy-to-apply legal

test or on/off switch[,]" so the Court must "slosh its way through a factbound morass." *Barnes v. Felix*, 605 U.S. 73, 80, 145 S. Ct. 1353, 221 L. Ed. 2d 751 (2025) (cleaned up). If the plaintiff offers some evidence that generates a genuine fact dispute as to the *Graham* factors, a jury must resolve those disputes to determine whether a constitutional violation occurred. *See, e.g.*, *Chappell v. City of Cleveland*, 585 F.3d 901, 909 (6th Cir. 2009) (finding, for example, that if "there is some evidence—more than a mere scintilla of evidence—that [an arrestee], through his conduct, judged from the perspective of reasonable officers on the scene, did not give the officers probable cause to believe that he posed a serious threat of harm, a genuine fact dispute is created").

Ordinarily, courts evaluate the reasonableness of force in segments, separately analyzing each application of force by each officer. *Smith v. City of Troy, Ohio*, 874 F.3d 938, 944 (6th Cir. 2017). Here, the Court will analyze the use of force in three segments: first, the takedown of Fasline by Sgt. Rauschenbach; second, the deployment of Ranger by Officer Xenakis; and third, the continued application of Ranger's bite to subdue Fasline. *See, e.g., Laury v. Rodriguez*, 659 F. App'x 837, 843–46 (6th Cir. 2016) (analyzing takedown and actions after a takedown separately).

### a.  Takedown (Sgt. Rauschenbach)

While it is not entirely clear from the complaint, it appears that Fasline is alleging that Sgt. Rauschenbach employed excessive force when he performed a takedown maneuver to bring him to the ground. (Doc. No. 1 ¶¶ 16, 30–32; *see* Doc. No. 40, at 8–9.) Specifically, Fasline argues that Sgt. Rauschenbach was investigating non-violent traffic offenses, and "was the initial aggressor and his use of force was unwarranted and unnecessary." (Doc. No. 40, at 8–9 (underlining omitted).) He notes that "Sgt. Rauschenbach initiated the physical contact with" Fasline, and he suggests that this "aggression was the cause of the escalation of the physical contact." (*Id*. at 9.)

12

Defendants counter by noting that the video evidence clearly shows that Sgt. Rauschenbach was responding to Fasline's failure to follow the sergeant's repeated directives to return to his vehicle, face the vehicle, and put his hands behind his back. (Doc. No. 42, at 5–6.) According to defendants, "it was [Fasline's] refusal to obey police commands and active resistance which supports the officer's exertion of force to arrest him." (*Id*. at 6.)

*Severity of the Crime*. While it is a close call, the first *Graham* factor is either neutral or slightly favors Fasline. In addition to the minor traffic offense (running a stop sign) Sgt. Rauschenbach witnessed, the sergeant was also responding to a report that Fasline was operating a motor vehicle while intoxicated and following his ex-girlfriend and yelling at her. Though potentially dangerous, operating a vehicle while impaired is "only moderately severe" for purposes of the first *Graham* factor analysis. *See LaPlante v. City of Battle Creek*, 30 F.4th 572, 580 (6th Cir. 2022) (finding that a misdemeanor offense of operating a vehicle under the influence of alcohol was "only moderately severe"). Additionally, while "[d]omestic-violence calls can often provide grounds to use force[,]" *Franke v. Janes*, 168 F.4th 797, 806 (6th Cir. 2026) (citing *Kapuscinski v. City of Gibraltar*, 821 F. App'x 604, 606, 609–10 (6th Cir. 2020)), Sgt. Rauschenbach did not have enough information at the time he initiated contact with Fasline to conclude that he was either investigating or attempting to stop the commission of a violent crime. Though there was certainly reason for Sgt. Rauschenbach to approach the scene with caution, given the nature of the call and Fasline's conduct immediately upon being pulled over, he did not know at the time he pulled Fasline over that the crime at issue was severe enough to necessitate the use of force.

*Immediate Threat to Safety and Active Resistance*. That all changed, however, the moment

13

Fasline refused to return to his vehicle and began to actively resist Sgt. Rauschenbach's efforts to arrest him. The Sixth Circuit has made it clear that a police officer may use force when the person is actively resisting arrest. *See Rudlaff*, 791 F.3d at 641 (collecting cases finding "it is not excessive force for the police to tase someone (even multiple times) when the person is actively resisting arrest." (emphasis omitted)). The court has found that a suspect engages in active resistance when he "physically struggles with police, threatens or disobeys officers, or refuses to be handcuffed." *Thomas v. City of Eastpointe*, 715 F. App'x 458, 460 (6th Cir. 2017) (citing, among authority, *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 495 (6th Cir. 2012), and collecting cases showing the distinction between passive and active resistance[4]). Even when the suspect is "suspected of relatively minor crimes," if the suspect resists, officers may respond with force. *See Wysong v. City of Heath*, 260 F. App'x 848, 855 (6th Cir. 2008).

In *Feagin*, for example, the court found "plenty" of evidence that the plaintiff had actively resisted officers' efforts to arrest him, including evidence that the plaintiff defied the repeated commands to get out of his vehicle (including rolling up his window and seeming to put his car in reverse), that he "struggled" with officers for several seconds as they tried to extract him from his vehicle, and, at the moment he was tased, he "was still not handcuffed, with his right arm flailing." *Feagin*, 155 F.4th at 606. "Collectively," the court found, "the undisputed evidence shows that [the defendant officer] acted reasonably in tasing" the plaintiff. *Id.*

Similarly here, Fasline defied a command to return to his car, and, rather than comply, he

---

[4] The Sixth Circuit has "long distinguished active resistance by arrestees from passive resistance" where "[t]he latter is generally shown by the lack of physical resistance or verbal antagonism." *Jackson v. Washtenaw Cnty.*, 678 F. App'x 302, 306 (6th Cir. 2017) (citations omitted). In contrast to active resistance, passive resistance will typically only justify a limited use of force. *See, e.g., Shreve v. Jessamine Cnty. Fiscal Court*, 453 F.3d 681, 687 (6th Cir. 2007).

14

continued to take several steps away from his vehicle. This action, alone, made force almost inevitable. Add to that the fact that Fasline ignored Sgt. Rauschenbach's multiple commands to turn his body to face the vehicle and place his hands behind his back and resisted—both physically and verbally—Sgt. Rauschenbach's efforts to turn him toward the car and place him in handcuffs. "No matter how you cut it, [Fasline] actively resisted arrest." *Rudlaff*, 791 F.3d at 642 (holding no genuine issue of fact as to active resistance where the plaintiff was "verbally defiant," swung his arms, and refused to give the officer his hands to be cuffed). The undisputed facts, as clearly captured in the police videos, demonstrate that Fasline was actively resisting arrest. Further, his defiant and combative behavior from the moment he exited the car placed everyone at the scene in danger, including the police officer and Ms. Rossadivita and Fasline's minor son, who were sitting in a vehicle feet away from where Fasline was struggling with the sergeant. Accordingly, the Court finds that the second and third *Graham* factors clearly support the use of force.

Based on the totality of circumstances surrounding Sgt. Rauschenbach's interactions with Fasline leading up to the use of a takedown maneuver—including Fasline's obvious active resistance—the use of force was objectively reasonable. *See Gambrel v. Knox Cnty., Ky.*, 25 F.4th 391, 402 (6th Cir. 2022) (collecting cases finding takedown maneuvers, knee strikes, and tases to be objectively reasonable where a suspect resists arrest).

Moreover, even if it were not objectively reasonable, Fasline has failed to demonstrate that any possible constitutional shortcoming was "clearly established." *See Barton v. Martin*, 949 F.3d 938, 950 (6th Cir. 2020) ("The plaintiff bears the burden of showing that a right was clearly established at the time of the alleged injury." (citation omitted)). At this second prong of the qualified immunity analysis, "[t]he contours of [a constitutional] right must be sufficiently clear

that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987). To be sufficiently clear, "'existing precedent must [] place[] the statutory or constitutional question beyond debate.'" *Smith*, 874 F.3d at 944 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011)). In other words, "the question is whether the defendants had 'fair warning' that their actions were unconstitutional.'" *Cummings v. City of Akron,* 418 F.3d 676, 687 (6th Cir. 2005) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002)); *see also District of Columbia v. Wesby*, 583 U.S. 48, 63, 138 S. Ct. 577, 199 L. Ed. 2d 453 (2018) (noting that to be clearly established the law must have been so clear that *every* reasonable officer in the defendant's shoes would have recognized that the force used was excessive—and not just in the abstract but in the *precise* situation the defendant was facing).

At this stage, it is Fasline's burden "to identify a closely analogous precedent that would have put [Sgt. Rauschenbach] on notice that his actions were unlawful given the information he possessed." *Feagin*, 155 F.4th at 606 (citation omitted). Yet, Fasline has failed to produce binding case law that would "put the precise question [of the legality of the use of force] 'beyond debate.'" *Rudlaff*, 791 F.3d at 643 (quoting *al-Kidd*, 563 U.S. at 741). Because Fasline has failed to come forward with any precedent that would demonstrate that an officer is not entitled to perform a takedown maneuver where a suspect has disobeyed multiple commands, physically resisting efforts to be handcuffed, and has verbally fought with the arresting officer, Sgt. Rauschenbach is entitled to qualified immunity for the takedown for this additional reason.

b.   Deployment of K-9 (Officer Xenakis)

Fasline also challenges Officer Xenakis' decision to deploy Ranger to subdue him with a

16

bite. (*See* Doc. No. 1 ¶ 17; Doc. No. 40, at 9–10.) "[D]eployment of a well-trained police dog is '[a]mong the various forms of force available to law enforcement, that is a comparatively measured application of force, which does not carry with it a substantial risk of causing death or serious bodily harm.'" *See Hunt v. Hunt*, No. 21-cv-11987, 2023 WL 5807053, at *3 (E.D. Mich. July 6, 2023) (quoting *Jarvela v. Wastenaw Cnty.*, 40 F.4th 761, 764 (6th Cir. 2022) (internal quotation marks omitted)). "This is true so long as deployment of the dog is reasonable under the circumstances, as measured by the *Graham* factors." *Id*. (citing *Zuress v. City of Newark*, 815 F. App'x 1, 5–6 (6th Cir. 2020)); *cf. Ziolkowski v. City of Taylor*, No. 12-cv-10395, 2013 WL 3872507, at *10 (E.D. Mich. July 24, 2013) ("It is well established that an attack by an unreasonably deployed police dog in the course of an arrest is a Fourth Amendment excessive force violation." (citing *Campbell v. City of Springsboro*, 700 F.3d 779, 787–89 (6th Cir. 2012))).

District courts have recognized that "Sixth Circuit decisions demonstrate that there is a continuum of permissible versus impermissible use when it comes to police dogs." *Filous v. Dunbar*, No. 1:18-cv-626, 2019 WL 2089109, at *10 (N.D. Ohio May 7, 2019) (quoting *Campbell v. City of Springboro*, 788 F. Supp. 2d 637, 675 (S.D. Ohio 2011)), *aff'd*, 700 F.3d 779 (6th Cir. 2012). In *Lambert v. Battle Creek Police Dep't*, the district court observed:

> Circuit precedent "demarcate[s] the outer bounds of excessive-force cases involving canine seizures with some degree of clarity." [*Baxter v. Bracey*, 751 F. App'x 869, 872 (6th Cir. 2018)]. At one extreme lies the apprehension of stationary suspects using an untrained police dog without warning, *see Campbell*, 700 F.3d 789; at the other, deploying a trained police dog to prevent a suspect in a dark and unfamiliar location from fleeing, *see Robinette v. Barnes*, 854 F.2d 909, 913–14 (6th Cir. 1988). Although the criteria for evaluating cases between these extremes are "much hazier," *Burgess v. Bowers*, 773 F. App'x 238, 246 (6th Cir. 2019), orientation is supplied by the Sixth Circuit's observation that "most" of its "excessive-force precedents involving police dogs find no violation at all." *Ashford v. Raby*, 951 F.3d 798, 803 (6th Cir. 2020).

No. 1:25-cv-403, 2026 WL 532446, at *3 (W.D. Mich. Feb. 26, 2026); *see Gannon v. Medina Twp*., No. 1:21-cv-601, 2022 WL 3028095, at *8 (N.D. Ohio Aug. 1, 2022) (similar) (citations omitted)).

In *Gannon v. Medina Twp*., defendant police officers initiated a traffic stop of a vehicle driven by the plaintiff and believed to be stolen. *Gannon*, 2022 WL 3028095, at *1. Video evidence from the stop revealed that the plaintiff refused to comply with the officers' repeated commands to step out of the vehicle and place his hands on his head and became verbally abusive to the officers. *Id*. at *2 (video revealed plaintiff told the officers to "go f*** yourself"). Eventually, the officers approached the vehicle, with weapons drawn, opened the car door, and instructed the police dog to bite the plaintiff. *Id*. at *3. Under these circumstances, the court found the deployment of the police dog to be objectively reasonable. *Id*. at *12.

Even though plaintiff was not "physically struggling with or threatening the officers," the court noted that the "video footage clearly show[ed] that [plaintiff] was verbally hostile and repeatedly failed to comply with their multiple commands to exit the vehicle." *Id*. at *10. "Faced with similar circumstances," the court noted, "the Sixth Circuit has found that a suspect was 'actively resisting[,]'" rendering the deployment of a police dog objectively reasonable. *Id*. (quoting *Zuress*, 815 F. App'x at 5–6 ("Between exiting her vehicle at the second traffic stop and the deployment of the canine, plaintiff did not have a physical struggle with the officers, and she did not orally threaten them. During that time, however, plaintiff argued with the officers and repeatedly failed to comply with their commands. We conclude that plaintiff's repeated non-compliance—coupled with her arguing with the officers—put her conduct just over the line into the active-resistance category.")).

18

Here, the Court has already determined that Fasline was actively resisting Sgt. Rauschenbach's efforts to arrest him at the time Officer Xenakis and Ranger arrived on the scene. Moreover, even after Sgt. Rauschenbach administered the takedown maneuver, it is clear from the videos that Fasline continued to physically resist Sgt. Rauschenbach's efforts to bring him to the ground and place him in handcuffs, and this physical resistance extended well beyond the verbal hostility or defiance found sufficient in *Gannon*. (*See* Doc. No. 35-3.3, at 1:24–:25.) Under these circumstances, Fasline's reliance on *Rainey v. Patton*, 534 F. App'x 391, 394 (6th Cir. 2013) is unavailing. There, the motorist was not actively resisting and did not inordinately delay in complying with the officer's command to lay on the ground before the police dog was deployed. *See id.* at 395.

Fasline takes issue with the conclusion that he was actively resisting, noting that Sgt. Rauschenbach had positioned himself on top and "appear[ed] to be preparing to cuff" him. (Doc. No. 40, at 10.) It is evident from Officer Xenakis's body worn camera, however, that Sgt. Rauschenbach was still attempting to gain control of Fasline, as Fasline was on his knees and Sgt. Rauschenbach is seen on top of Fasline with his feet in the air attempting to force Fasline to the ground. (Doc. No. 35-3.1, at :15.) The video evidence clearly shows that Fasline was not in the process of complying, or that the danger that he posed was not otherwise neutralized when Officer

Xenakis arrived.[5]

Fasline also isolates a still shot from Officer Xenakis' body worn camera displaying himself kneeling immediately after Ranger was released from Sgt. Rauschenbach's leg. (Doc. No. 40, at 10 (citing Doc. No. 35-3.1).) He posits that this still image "completely rebut[s]" defendants' position that he continued to resist following the takedown. (*Id*.) There are several problems with this evidence. First, the still shot demonstrates that, rather than laying on the ground in compliance after he observed Sgt. Rauschenbach receive a bite from the police dog, Fasline elected to get up, forcing Officer Xenakis to engage Fasline to attempt to bring him back to the ground so that he could be cuffed. Second, and, perhaps, more fundamentally, the evidence fails because Officer Xenakis was not responding to the incident in discrete slices of time that afforded him the luxury to evaluate body language and other social cues on a frame-by-frame basis. Rather, the Supreme Court in *Graham* recognized that situations, such as the one in the present case, require officers to "make split-second judgments" in "tense, uncertain[], and rapidly evolving" circumstances. *Graham*, 490 U.S. at 396–97. When the video evidence is shown in its entirety—as the situation unfolded in real-time—it is clear that Officer Xenakis arrived on the scene of a chaotic, fluid, and rapidly evolving situation where the suspect continued to resist arrest, even after an officer had been bitten by the police dog. *See Feagin*, 155 F.4th at 610–12 (refusing to consider only the

---

[5] Fasline also suggests that "[h]ad Officer Xenakis simply left his canine in his vehicle and helped Sgt. Rauschenbach cuff Plaintiff, neither Rauschenbach, nor Plaintiff would have been bitten by a police canine that night." (Doc. No. 40, at 10.) It is possible that this would have been the outcome, but the "Fourth Amendment does not require officers to use the best technique available" for restraining a suspect "as long as their method is reasonable under the circumstances." *Puskas v. Delaware Cnty.*, 56 F.4th 1088, 1095 (6th Cir. 2023) (rejecting similar argument that officers should have tased plaintiff rather than deploy a police dog to secure his arrest (citations omitted)); *see Lambert*, 2026 WL 532446, at *4 (finding that plaintiff's "continued refusal to comply with police directives, when combined with the officers' uncertainty about whether Lambert was armed, rendered the officers' choice to apprehend Lambert via police canine rather than direct physical restraint or taser defensible" (citing *Puskas*, 56 F.4th at 1095)). Because the totality of the circumstances supported the deployment of the police dog to subdue an actively resisting suspect, it does not matter that another method might have achieved the same result.

20

seconds immediately before the deployment of a taser and recognizing that "the totality of the circumstances, not just one circumstance in isolation, informs [the court's] views" (citation omitted)).

Fasline further argues that the initial deployment of Ranger was objectively unreasonable because the videos do not clearly record Officer Xenakis warning Fasline that he would be bitten if he continued to resist. (Doc. No. 40, at 9–10.) The Court agrees that there remains a question of fact as to whether Officer Xenakis issued a warning before he released Ranger. This factual dispute, however, does not preclude summary judgment for the simple reason that it does not represent a *material* question of fact. *See Liberty Lobby, Inc.*, 477 U.S. at 248 (explaining that a fact is "material" only if its resolution will affect the outcome of the lawsuit).

As noted, this was a chaotic and volatile situation where an actively resisting suspect's actions had placed everyone at the scene, including the officers, in danger. Regardless of whether Fasline had been specifically warned about the release of Ranger, he had been given numerous other warnings and had multiple opportunities to comply with the officers' various commands before the police dog was deployed. He elected not to do so, instead choosing to argue with the officers and physically resist their efforts to place him in handcuffs. Fasline was also on notice of the dog's presence and the potential for it to bite. Indeed, Fasline was next to Sgt. Rauschenbach when he was bitten and he immediately got up in response to the bite, rather than laying on the ground in compliance. Based on these facts, the Court finds that, even if no warning was given before the dog was released, the deployment of Ranger was objectively reasonable. *See, e.g., Puskas v. Delaware Cnty.*, No. 2:19-cv-2385, 2022 WL 874850, at *4 (S.D. Ohio Mar. 24, 2022) (finding that "even if there were a genuine dispute over whether a warning was given, it was

21

reasonable for the Individual Defendants to release [the police dog] given the volatile situation and Mr. Pusakas's access to firearms in the yard" (citation omitted), *aff'd*, 56 F.4th 1088 (6th Cir. 2023); *Phipps ex. Rel. Phipps v. Goecker*, No. 11-11706, 2012 WL 2367166, at \*9 (E.D. Mich. June 21, 2012) (finding that even if no warnings were given prior to releasing the police dog, the fact that plaintiff did not respond to officers he knew were tracking him, did not bring his hands out from underneath his body, and did not give up until after the police dog had bitten him, supported the reasonableness of the deployment of the police dog).

Moreover, *Puskas*, *Phipps* and other relevant case law demonstrate that Officer Xenakis did not violate any clearly established Fourth Amendment rights when he allegedly failed to issue a warning before releasing Ranger. As the court recognized in *Miller v. Rybicki*, 259 F. Supp. 3d 688, 699 (E.D. Mich. 2017), neither the Supreme Court nor the Sixth Circuit has adopted a "bright-line rule that an officer must warn a suspect before allowing a dog to bite." *See also Jarvela*, 40 F.4th at 765 (holding that "the Constitution does not require a canine handler always to shout out a warning to a fleeing suspect" (collecting cases)). Fasline has failed to establish that "then-existing precedent" puts the alleged illegality of Officer Xenakis' conduct "beyond debate." *Wesby*, 583 U.S. at 63. In particular, he has not demonstrated that the law is so clear that *every* reasonable officer confronting the situation Officer Xenakis found—an actively resisting suspect fighting on the ground with another officer—would have understood that releasing a well-trained police dog

22

to neutralize the threat without first stopping to issue a warning was excessive.[6] *See also Puffpaff v. Labish*, No. 18-cv-10453, 2019 WL 247238, at *6 (E.D. Mich. Jan. 17, 2019) (recognizing that "there is no binding law in the Sixth Circuit that would put a reasonable officer on notice that a subject resisting arrest had the right to be warned before physical force or a taser is used to bring a subject to the ground in order to be secured" (citing *Thomas*, 715 F. App'x at 460)).

c.  Continued Application of K-9 (Officer Xenakis)

Even if the initial deployment of Ranger was reasonable, Fasline appears to argue that it was unreasonable to continue to permit Ranger to bite Fasline for nearly 60 seconds, "precluding him from placing his hands behind his back[,]" before using the breaker bar to release him. (Doc. No. 40, at 12.)[7] In *Zuress*, the Sixth Circuit recognized that "it is possible for 'a delay in calling off [a police] dog . . . [to] rise to the level of an unreasonable seizure.'" *Zuress*, 815 F. App'x at 7 (quoting *Greco v. Livingston Cnty.*, 774 F.3d 1061, 1064 (6th Cir. 2014)). The court found, however, that the facts surrounding the plaintiff's arrest did "not support a Fourth Amendment violation." *Id*. In reaching this conclusion, the court noted that the canine handler released the

---

[6] Fasline cites generally to *Campbell*, 700 F.3d 779 for the proposition that Officer Xenakis' actions were unreasonable. (*See* Doc. No. 40, at 8.) It is true that in *Campbell*, the Sixth Circuit found "ample evidence to suggest that [the officer] acted contrary to clearly established law when he used an inadequately trained canine, without warning, to apprehend two suspects who were not fleeing." *Id*. at 789. The court, in *Campbell*, however, emphasized the fact that the officer had not kept current with the police dog's training, and that the dog had "issues with excessive biting and the failure to keep [the dog] on the accepted training regimen may well have played a role in [the dog's] aggressive behavior" and the fact that he bit a suspect without a command to do so. *Id*. at 787–88. Unlike the police dog in *Campbell*, it is undisputed that Ranger was highly trained and current with his certification and instruction. (Doc. No. 32, at 5(14).) Moreover, Fasline has failed to identify any other instances where Ranger had previously disobeyed commands or otherwise acted inappropriately in subduing a suspect. These facts take the present situation well outside the holding in *Campbell*.

[7] Fasline offers this argument in connection with his discussion of his failure to intervene claim. (*See id*.) Given that an officer cannot fail to intervene with himself, the Court finds it more appropriate to consider whether the continued deployment of Ranger by Officer Xenakis was reasonable, rather than whether he failed to intervene by delaying in releasing Ranger from Fasline's arm. *See, e.g., Francis v. French*, No. 2:23-cv-2658, 2023 WL 8021539, at *4 (S.D. Ohio Nov. 20, 2023) ("Logically, Defendants could not have failed to intervene with their own conduct, and the officers' affirmative actions are better analyzed as part of Plaintiff's Fourth Amendment claims.").

23

police dog within approximately eleven seconds after another officer had taken his place holding down plaintiff. *Id.* "Such a short amount of time—some of which involved defendant [officer] directing other officers to check the vehicle for officer-safety purposes—was not the kind of delay that rise[s] to the level of an unreasonable seizure." *Id.* (quotation marks and citations omitted).

Here, the record is clear that Officer Xenakis was left to deal with a resisting suspect while Sgt. Rauschenbach addressed his own bite injury. Fasline disregarded Officer Xenakis' commands to put his left hand behind his back, even when assured that Ranger would come off the bite as soon as he was in handcuffs. Once it became apparent to Officer Xenakis that he, alone, could not secure the handcuffs, he requested Sgt. Rauschenbach's assistance. The time that elapsed from when he asked Sgt. Rauschenbach for help to when he used the breaker bar to release Ranger— which included the time Sgt. Rauschenbach needed to walk back to Officer Xenakis and the time needed to instruct Sgt. Rauschenbach in how to secure Fasline so that he could administer the breaker bar—was, at most, 14 seconds. (Doc. No. 35-3.1, at 1:08–1:22.) Such a delay was not constitutionally unreasonable, given the totality of the circumstances. *See Ashford*, 951 F.3d at 803–04 (noting that officer's continued use of police dog bite was reasonable where officer gave release command within seconds of one officer securing suspect's arm); *see also Gannon*, 2022 WL 3028095, at *13 (finding "it was reasonable for Officer Gibbons to have [the police dog] maintain his bite hold on Gannon before he was handcuffed. Officer Gibbons has come forward with evidence that Gannon was actively resisting, i.e., the video recording in which Officer Brenenstuhl can be heard say 'stop fighting' and 'don't resist'").

Fasline also seems to argue that once he was bitten, he was prevented from complying with Officer Xenakis' commands to put his left hand behind his back because Ranger "was pulling it

24

away from his body[.]" (Doc. No. 40, at 12.) Even though the videos do not clearly show Ranger attempting to pull Fasline's arm away from his body, the dog can be seen biting, tugging, and holding onto Fasline's arm with his mouth, and Fasline can be heard on Officer Xenakis' body worn camera responding to the officer's direction to put his left hand behind his back by insisting that he "can't" because the dog had a hold of his arm. (Doc. No. 35-3.1, at :31–:52.) Yet, contrary to Fasline's suggestion, the factual question of whether Fasline was temporarily prevented from complying need not preclude summary judgment.

This Court must judge the reasonableness of the officer's conduct from "the perspective of a reasonable officer at the scene[,]" rather from that of the suspect. *Jackson-Gibson*, 118 F.4th at 854 (citation omitted); *see, e.g., Ashford*, 951 F.3d at 802 (recognizing that "we must consider what was reasonable from the *officer's* perspective, not the suspect's" (emphasis in original) (citation omitted)).[8] Here, Officer Xenakis encountered an already resisting suspect, whom he was aware from prior encounters had a history of fighting with the police. Under these circumstances, the Court cannot find that it was unreasonable for Officer Xenakis to assume that Fasline was continuing to resist arrest, rather than find that Fasline had suddenly decided to comply and was merely prevented from doing so by the force applied by Ranger.[9] *See also Guptill v. City of Chattanooga*, 160 F.4th 768, 776–77 (6th Cir. 2025) (noting that the reasonableness analysis is

---

[8] In *Ashford*, the Sixth Circuit found that the officer's decision to use force was reasonable, notwithstanding the suspect's stated reasons for being unwilling to comply. The court explained that "even if [the officer] heard [the suspect's] explanations, he could not peer into [the suspect's] heart to assess his good faith. All [the officer] knew about the suspect in front of him was that he had been driving erratically and at excessive speeds, had refused a lawful signal to pull over, had stopped only when forced to, and even then had left his vehicle in drive for some unknown reason." 951 F.3d at 802.

[9] Of course, Fasline's implied suggestion that he was attempting to comply is belied by the fact that he continued to resist Sgt. Rauschenbach's efforts to handcuff him, even after Officer Xenakis released Ranger's bite. (*See* Doc. No. 35-3.1, at 1:26–:33; Doc. No. 35-3, at 2:41.)

25

based on the "totality of the circumstances" surrounding the force and "looks only to the facts the defendant officer knew at the time" (citations omitted)). The fact that he released Fasline from Ranger's bite before Sgt. Rauschenbach had fully secured the cuffs lends further support for the objective reasonableness of Officer Xenakis' conduct. (*See* Doc. No. 35-3.1, at 1:26–:33; Doc. No. 35-3, at 2:41.)

Because their actions were reasonable, and because they violated no clearly established constitutional right owed to Fasline when they employed force to arrest him, Sgt. Rauschenbach and Officer Xenakis are entitled to qualified immunity on Fasline's excessive force claim.

### 2. *Count Six—Failure to Intervene*

In Count Six, Fasline alleges that "[d]uring the Constitutional violations described [in the complaint] one or more of the individual Defendants failed to intervene, despite having a reasonable opportunity to prevent the misconduct." (Doc. No. 1 ¶ 61.) "Section 1983 generally prohibits a plaintiff from holding one officer liable for another's actions." *Chaney-Snell v. Young*, 98 F.4th 699, 721 (6th Cir. 2024) (citation omitted). "And an officer's 'mere presence' at the scene of excessive force generally does not suffice to hold the officer liable for the force." *Id.* (quoting *Burgess v. Fischer*, 735 F.3d 462, 475 (6th Cir. 2013)). An officer who fails to intervene to prevent another officer's use of excessive force can, however, face liability if he "'observed' the force 'or had reason to know' a colleague would use it[,]" and "[h]e 'had both the opportunity and the means' to stop it." *Id.* at 722 (quoting *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)).

As an initial matter, this claim fails because Fasline has not established the existence of a constitutional violation. *See Hunt v. Sunquist*, 822 F. App'x 468, 478–79 (6th Cir. 2020) ("If no excessive force was used, [an officer] cannot be responsible for failing to intervene." (citations

26

omitted)). Because the Court has found that each officers' use of force was objectively reasonable, Fasline is unable to establish that the other officer should have intervened to prevent or stop it. *See Lewis v. City of Cleveland*, No. 1:13-cv-589, 2015 WL 5920172, at *7 (N.D. Ohio Oct. 9, 2015) ("The Plaintiff's claim for failure to intercede or intervene is based entirely on his presupposition that his arrest was improper. As the Court has found that his arrest was proper under federal law, this claim cannot be supported.")

Moreover, even if excessive force had been employed, the record would not support a finding that either officer could have intervened to stop it. Fasline suggests that "Officer Xenakis could have removed the dog from [Fasline's] arm, commanded him to remain face down on the ground, at which time [Fasline] would have had no choice but to comply." (Doc. No. 40, at 12.) Putting aside Fasline's unsupported speculation—that having failed to comply with any other command, he would have obeyed a command from Officer Xanakis—the Court has already found both that Officer Xenakis could not have failed to intervene in his own use of force and that he appropriately extended the application of the dog bite until Fasline was handcuffed.

As for Sgt. Rauschenbach, Fasline suggests that he could have, as the senior-ranking officer at the scene, "ordered Officer Xenakis to remove the dog from [Fasline's] arm at any time as [Fasline] was not a threat to either officer."[10] (Doc. No. 40, at 12–13.) Yet, Fasline has failed to identify any authority holding or even suggesting that an officer who is not trained as a dog handler

---

[10] The complaint does not raise a claim against Sgt. Rauschenbach for supervisor liability. To be liable, a supervisor must have "either encouraged the specific incident of misconduct or in some other way directly participated in it." *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (quotation marks and citation omitted). "At a minimum, a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Id*. (quotation marks and citation omitted). Fasline has not alleged, and the record on summary judgment would not support a finding, that Sgt. Rauschenbach's actions would have resulted in supervisory liability.

has a duty to intervene to control a police dog when the dog's handler is present. *See Hammond v. Cnty. of Oakland*, 825 F. App'x 344, 347 (6th Cir. 2020) (granting qualified immunity to officers on failure to intervene claim where the plaintiff cited "no caselaw clearly establishing that officers who are not trained as dog handlers have a duty to intervene and control a dog notwithstanding the presence of the dog's handler").

Further, the undisputed video evidence is clear that Sgt. Rauschenbach had no realistic opportunity to intervene at any time during the encounter. At the time Officer Xenakis first deployed Ranger, Sgt. Rauschenbach was engaged with Fasline trying to control him and place him in handcuffs. The Sixth Circuit has held that when an officer is occupied with controlling a suspect's body while another officer employs force, no reasonable jury could find that the restraining officer had the opportunity to intervene. *See Wright v. City of Euclid*, 962 F.3d 852, 872 (6th Cir. 2020) (citation omitted). Once he was accidentally bitten, Sgt. Rauschenbach was otherwise occupied with his own injury, and the videos clearly show that he was in considerable pain, precluding him from immediately assisting Officer Xenakis. Under these circumstances, it cannot be said that he had a realistic opportunity to intervene, even if excessive force had been used.

For all of these reasons, Fasline's failure to intervene claim fails as a matter of law.

### B.  Immunity for State Law Claims

Section 2744 of the Ohio Revised Code extends to municipalities immunity from tort liability for governmental and proprietary functions. Ohio Rev. Code § 2744.02(A)(1); *Chesher v. Neyer*, 477 F.3d 784, 796 (6th Cir. 2007). It is well settled that "government functions" include the operations of law enforcement. *See* Ohio Rev. Code § 2744.01(C)(2)(a); *Harris v. Sutton*, 918

N.E.2d 181, 185 (Ohio Ct. App. 2009) (citations omitted). There are, however, certain exceptions to the general grant of immunity spelled out in the statute. Specifically, § 2744.02(B) provides five instances where immunity is not available to a municipality: (1) injury or damage is caused by a municipal employee's negligent operation of a motor vehicle; (2) losses are due to the negligent performance of employees with respect to proprietary functions of a political subdivision; (3) damages are the result of a municipality's negligent failure to keep public roads in repair; (4) damages are the result of a physical defect on the grounds of public buildings used for government functions; and (5) civil liability is expressly imposed by another provision of the Ohio Revised Code.

Though his opposition brief is not entirely clear on this point, Fasline appears to argue that the fifth exception—civil liability is expressly imposed by another provision of the Ohio Revised Code—applies. (*See* Doc. No. 40, at 15.) In particular, he notes that there is a split in authorities as to whether Ohio Rev. Code § 955.28(B), which imposes liability on a dog "owner, keeper, or harborer" for injuries or property damage caused by the dog, applies to K-9 handlers. (Doc. No. 40, at 15.) Yet, he concedes that § 955.28(B) "does not arguably contain any provision that expressly creates liability upon a political subdivision[.]" (*Id.*) This concession is fatal to municipality liability under Ohio Rev. Code § 2744.02(B)(5).

The Ohio Supreme Court has held that, for Ohio Rev. Code § 2744.02(B)(5) to divest a municipality of immunity from state torts, "another section of the Revised Code" must "expressly impose[] liability on the political subdivision." *Cramer v. Auglaize Acres*, 865 N.E.2d 9, 14 (Ohio 2007). The term "expressly" in § 2744.02(B)(5) means "in direct or unmistakable terms: in an express manner: *explicitly, definitely, directly*." *Butler v. Jordan*, 750 N.E.2d 554, 558 (Ohio 2001)

29

(emphasis in original) (citation omitted). In other words, to "expressly" impose liability on a political subdivision, a statute must state that a political subdivision is liable and not simply recite that some general category of persons is liable. *See O'Toole v. Denihan*, 889 N.E.2d 505, 516 (Ohio 2008) (statute that imposed liability upon a "person" without mentioning political subdivisions did not expressly impose liability under § 2744.02(B)(5)).

As discussed more fully below, Ohio Rev. Code § 955.28(B) generally imposes liability upon "the owner, keeper, or harborer of a dog[,]" and makes no mention of political subdivisions or their employees. Because it does not "expressly" impose liability upon a municipality, § 2744.02(B)(5) cannot serve to divest the City of immunity. *See Callaway v. Akron Police Dep't*, 183 N.E.3d 1, 7 (Ohio Ct. App. 2021) (finding that because Ohio Rev. Code § 955.28(B) did not expressly impose civil liability upon the City, the trial court did not err in finding that the City was immune under Ohio Rev. Code § 2744.02(B)(5)); *cf. Moore v. Loraine Metro. Housing Auth.*, 905 N.E.2d 606, 610 (Ohio 2009) (statute imposing liability on landlords as a general matter did not expressly impose liability upon political subdivisions that provided public housing); *Cramer*, 865 N.E.2d at 14 (discussing the requirement that the statute "expressly" impose liability on a municipality).

Based on the undisputed fact that the underlying incident involved an investigatory traffic stop, there can be no doubt that the City qualifies for immunity under Ohio Rev. Code § 2744.02(A)(1), as its employees were engaged in the governmental function of police activities. None of the five exceptions applies to the circumstances as they are known following discovery. Thus, to the extent that the municipality is sued under Ohio state law, it is entitled to immunity for Fasline's state tort claims. *See generally Hout v. City of Mansfield*, 550 F. Supp. 2d 701, 744 (N.D.

Ohio 2008) ("Ohio courts have held that political subdivisions are entitled to immunity under §

2744.02 for the intentional torts committed by their employees." (citations omitted)).

Chapter 2744 of the Ohio Revised Code also provides immunity from tort actions for

employees of political subdivisions, except where the employee acted "manifestly outside the

scope of the employee's employment or official responsibilities[,]" the employee acted "with

malicious purpose, in bad faith, or in a wanton or reckless manner[;]" or "[c]ivil liability is

expressly imposed upon the employee by a section of the Revised Code." Ohio Rev. Code §

2744.03(A)(6). Fasline does not question that the actions of Sgt. Rauschenbach and Officer

Xenakis in investigating certain crimes and traffic offenses and effectuating his arrest were within

the scope of their duties as police officers. Rather, he argues that they performed these duties

recklessly. (Doc. No. 40, at 14.)

"Reckless conduct" is "characterized by the conscious disregard of or indifference to a

known or obvious risk of harm to another that is unreasonable under the circumstances and is

substantially greater than negligent conduct." *Id*.[11] (citations omitted). Based on the same analysis

presented above with respect to federal qualified immunity, the Court concludes that there are no

genuine issues of material fact and that the individual defendants are entitled to immunity from

liability in connection with Fasline's state law claims. Just as Fasline failed to demonstrate that the

officers' actions were objectively unreasonable, Fasline also fails to show that the officers acted

---

[11] "Malice" is the "willful and intentional design to injure or harm another, usually seriously, through conduct that is unlawful or unjustified." *Otero v. Wood*, 316 F. Supp. 2d 612, 629 (S.D. Ohio 2004) (citations omitted). "Bad faith" includes a "dishonest purpose, conscious wrongdoing, or breach of a known duty through some ulterior motive." *Id*. (citations omitted). "Wanton misconduct" is defined as "the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is a great probability that harm will result." *Anderson v. City of Massillon*, 983 N.E.2d 266, 273 (Ohio 2012) (citation omitted).

in a "reckless manner." *Chappell*, 585 F.3d at 916 n.3 ("Inasmuch as plaintiff has failed to demonstrate that defendants' conduct was objectively unreasonable [under § 1983], it follows that she has also failed to demonstrate that defendants acted with "malicious purpose, in bad faith, or in a wanton or reckless manner," such as is required to avoid statutory immunity under Ohio law."); *see Pollard v. City of Columbus*, 780 F.3d 395, 404 (6th Cir. 2015) ("If the officers were objectively reasonable in shooting Bynum, it logically follows that they could not have been reckless in shooting Bynum"); *Mullins v. Cyranek*, 805 F.3d 760, 769 (6th Cir. 2015) ("Because we find that [the officer's] use of deadly force was not objectively unreasonable under the circumstances, it follows that he did not act with 'malicious purpose, in bad faith, or in a wanton or reckless manner,' as required to avoid statutory immunity under Ohio law." (quoting Ohio Rev. Code § 2744.03(A)(6)(b))).

Fasline also argues that Officer Xenakis is not entitled to immunity for Count Two—which alleges liability under Ohio Rev. Code § 955.28(B)—for the additional reason that § 955.28(B) expressly imposes liability on a canine handler police officer. (Doc. No. 40, at 14–15.) He argues that a police officer who is a canine handler is a "keeper" under § 955.28(B), and, therefore, the exception in Ohio Rev. Code § 2744.03(A)(6)(c) applies to overcome Officer Xenakis' immunity for Count Two. (*Id.*)

When a federal court exercises subject-matter jurisdiction over a complaint on the basis of a federal question, supplemental state law claims are resolved by applying the law of the forum state. *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966) (citation omitted). In applying Ohio law in a situation (such as here) where the Ohio Supreme Court has yet to address the issue, the district court must determine how the state's

32

highest court would decide the issue. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 636 (6th Cir. 2018) (quotation marks and citation omitted). Stated, differently, the court must "predict how the [state supreme] court would rule by looking to all the available data[.]" *See Berrington v. Wal-Mart Stores, Inc.*, 696 F.3d 604, 608 (6th Cir. 2012) (quoting *Allstate Ins. Co. v. Thrifty Rent-A-Car Sys., Inc.*, 249 F.3d 450, 454 (6th Cir. 2001)). "The Court may use the decisional law of the state's lower courts, other federal courts construing state law, restatements of law, law review commentaries, and other jurisdictions on the 'majority' rule in making this determination." *Meridian Mut. Ins. Co. v. Kellman*, 197 F.3d 1178, 1181 (6th Cir. 1999) (citation omitted).

To resolve the question of whether Officer Xenakis is entitled to immunity under Ohio Rev. Code § 2744.03(A)(6) for Count Two, the Court must determine whether Ohio's high court would find that "[c]ivil liability is expressly imposed upon the employee" under Ohio Rev. Code § 955.28(B). *See* Ohio Rev. Code § 2744.03(A)(6)(c). The majority of state appellate courts to address the issue have found that no such liability is "expressly imposed" on municipal employees, including K-9 handlers. *See Callaway*, 183 N.E.3d at 7–8; *Alden v. Dorn*, No. 27878, 2016 WL 635225, at *3 (Ohio Ct. App. Feb. 17, 2016); *Jamison v. Stark Cnty. Bd. of Commr's*, No. 2014CA44, 2014 WL 5586143, at *5 (Ohio Ct. App. Nov. 3, 2014); *see also Tasse v. Marsalek*, No. 109113, 2020 WL 6335927, at *8 (Ohio Ct. App. Oct. 29, 2020) (finding Ohio Rev. Code § 955.28(B) did not expressly impose civil liability on an animal control officer (citing *Jamison*, 2014 WL 5586143, at *5)).

Fasline is correct, however, that at least one state appellate court has reached a different conclusion. In *Hicks v. Allen*, the Eleventh District found that a police officer with K-9 handling duties was not immune, pursuant to Ohio Rev. Code § 2744.03(A)(6)(c), from liability for injuries

33

sustained by the plaintiff from his police dog's bite. No. 2005-A-2, 2007 WL 508385, at *3 (Ohio Ct. App. Feb. 16, 2007). In reaching this conclusion, the court reasoned that Ohio Rev. Code § 955.28(B) "imposes liability on '[t]he owner, keeper, or harborer of a dog *** for any injury *** to person or property that is caused by a dog ***.'" *Id.* (quoting Ohio Rev. Code § 955.28(B).) It went on to note that "[a] keeper, in the context of [Ohio Rev. Code §] 955.28(B) is one having physical charge or care of the dog.'" *Id.* (quoting, among authority, *Lewis v. Chovan*, No. 05AP-1159, 2006 WL 1681400, at *3 (Ohio Ct. App. June 20, 2006)). Finding that the police officer qualified as a keeper under Ohio Rev. Code § 955.28(B), it determined that § 955.28(B) "expressly impose[d] civil liability" upon him. *Id.*

The Court respectfully disagrees with the holding in *Hicks* because it fails to apply the proper analysis. The question before this Court is not whether a police officer K-9 handler qualifies under Ohio Rev. Code § 955.28(B) as an "owner, keeper, or harborer of a dog[,]" or even whether the officer would be liable for damages if sued under § 955.28(B) and no immunity were available. When considering whether a police officer's grant of general immunity is lifted under § 27743.03(A)(6)(c), the proper inquiry is whether "[c]ivil liability is expressly imposed" upon the municipal employee by statute. Ohio Rev. Code § 2744.03(A)(6)(c). The court in *Hicks* failed to appreciate this distinction. *See Callaway*, 183 N.E.3d at 7 (noting that the court in *Hicks* impermissibly "based its conclusion strictly upon the definition of the term 'keeper' and the fact that the deputy sheriff satisfied that definition as a person having physical charge of the dog").

The Court finds that the majority of state appellate courts apply the proper analysis. These cases have started by recognizing that Ohio Rev. Code § 955.28(B) "is a general liability statute. [] By its plain language, it does not expressly impose civil liability upon political subdivisions or

34

their employees." *Callaway*, 183 N.E.3d at 7 (citing *Alden*, 2016 WL 635225, at *3; *Jamison*, 2014 WL 5586143, at *4–5 (record citation omitted)). They further reason that, "[i]nstead, it applies to any person who is an owner, keeper, or harborer of a dog." *Id.* (citing Ohio Rev. Code § 955.28(B).) "Words which refer to an entire class which may include employees of a political subdivision but do[] not expressly, explicitly, or directly reference employees of a political subdivision are not sufficient to *expressly impose liability* under [Ohio Rev. Code §] 2744.03(A)(6)(c)." *Id.* (quoting *Jamison*, 2014 WL 558143, at *5 (emphasis added)).

Not only is this reasoning persuasive, it is also consistent with Ohio Supreme Court guidance on the proper application of the word "expressly" discussed *supra*. *See Butler*, 750 N.E.2d at 558 (noting that the term "expressly" means that "in direct or unmistakable terms: in an express manner: *explicitly, definitely, directly*"). Moreover, the Ohio Supreme Court has previously ruled that the language of Ohio Rev. Code § 2744.02(B)(5) requiring the existence of a statute that "expressly imposes liability"—which is virtually identical to the language of § 2744.03(A)(6)(c)—means that the statute must expressly state that a political subdivision is liable and not simply recite that some general category of persons is liable. *See O'Toole*, 889 N.E.2d at 516. Following this reasoning, Ohio Rev. Code § 955.28(B) must expressly state that a municipal employee who is a K-9 handler is liable for damages (to be a qualifying reason to deny employee immunity under Ohio Rev. Code § 2744.03(A)(6)(c)), which it does not.

Consistent with this reasoning, as well as the reasoning of the majority of the Ohio appellate courts, the Court predicts that the Ohio Supreme Court would rule that Ohio Rev. Code § 955.28(B) is a general liability statute that does not "expressly impose[]" civil liability on police

35

officers who have K-9 handling duties. Accordingly, the Court finds that Ohio Rev. Code § 2744.03(A)(6)(c) does not divest Officer Xenakis of state tort immunity.

## IV. CONCLUSION

The Court finds that Sgt. Rauschenbach and Officer Xenakis are entitled to qualified immunity on Fasline's federal claims under 18 U.S.C. § 1983 (Counts One and Six), defendants are entitled to statutory immunity for Fasline's state law claims (Counts Two, Three, and Eight), and, as previously observed, Fasline has conceded that there is insufficient evidence to support Counts Four, Five, Seven, and Nine. Thus, for all the foregoing reasons, defendants' motion for summary judgment is granted, and this case is dismissed.

**IT IS SO ORDERED**.

Dated: July 23, 2026

**HONORABLE SARA LIOI**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**